# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **HENRY EUDONE DONNIE VINSON,** | } } } | |
| **Plaintiff,** | } } | |
| **v.** | } } **Case No.:  3:22-cv-00540-MHH** } } | |
| **CHRIS HARGETT,** | } } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

This action concerns back-to-back traffic stops.  Henry Eudone Donnie Vinson alleges that the City of Russellville's Police Chief, Chris Hargett, violated his Fourth Amendment rights during the second stop by unlawfully arresting him and using excessive force during the arrest.  Mr. Vinson asserts Fourth Amendment claims against Chief Hargett under 42 U.S.C. § 1983.[1]  Chief Hargett has moved for summary judgment on Mr. Vinson's claims.

---

[1] Mr. Vinson has not indicated whether he is suing Chief Hargett in his individual capacity or official capacity.  (*See* Doc. 1).  "In cases where a complaint does not specify clearly whether officials were sued in their official capacity, the 'course of proceedings' will 'indicate the nature of the liability sought to be imposed.'" *Stevens v. Gay*, 864 F.2d 113, 115 (11th Cir. 1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1983)).  Mr. Vinson is seeking compensatory damages for alleged constitutional violations.  Compensatory damages generally are not available in official capacity suits, but damages are available in suits against a state actor in his or her individual capacity. *Hafer v. Melo*, 502 U.S. 21, 25–31 (1991) (explaining the *Graham* decision and distinguishing official capacity suits from individual capacity suits); *see also Graham*, 473 U.S. at 169 (collecting cases).  Therefore, the course of proceedings indicate that Mr. Vinson is suing Chief Hargett in his individual capacity.

1

This opinion opens with a statement of the legal standard that governs motions for summary judgment.  Then, consistent with that standard, the Court summarizes the evidence in the summary judgment record, presenting the evidence in the light most favorable to Mr. Vinson, the non-moving party.  Finally, the Court analyzes the evidence under the substantive law that governs Mr. Vinson's Fourth Amendment claims to determine whether there are disputed questions of material fact for a jury to resolve.

## I.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment.  Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in

2

the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Because Chief Hargett moved for summary judgment, in this opinion, the Court presents the evidence in the light most favorable to Mr. Vinson.

## II.

In 2020, Chris Hargett was the Chief of Police for the Russellville Police Department in Russellville, Alabama. On May 11, 2020, Chief Hargett was patrolling Highway 43 in an unmarked Dodge Durango SUV. (Doc. 34-1, p. 14, tpp. 46:13–47:16; Doc. 34-2, p. 10, tp. 32:15–19).[2] Highway 43 runs through Russellville. (Doc. 34-2, p. 18, tpp. 64:18–24). A grass median separates the highway's two northbound lanes from its two southbound lanes. (Doc. 43-1, p. 14, tpp. 51:21–52:2). Chief Hargett's Durango had sets of emergency lights across the interior windshield visor and along the vehicle's front grill, and the vehicle was equipped with sirens that could either "yelp" or "wail." (Doc. 34-2, p. 14, tp. 48:6–9; *see* Doc. 34-3, p. 58). Because it was unmarked, the patrol unit did not have Russellville Police Department logos, a lightbar along the top of the vehicle, or a dash camera. (Doc. 34-2, pp. 11, 12, tpp. 36:6–23, 37:10–22; Doc. 34-3, p. 58).[3]

---

[2] Chief Hargett regularly spent time on patrol. (Doc. 34-2, p. 11, tpp. 33:11–34:24).

[3] None of Russellville Police Department's unmarked units had dashcams at the time. (Doc. 34-2, p. 12, tp. 39:1–7).

While patrolling Highway 43, Chief Hargett witnessed the driver of a black Chevy Cruze commit a traffic violation. (Doc. 34-2, p. 45). Chief Hargett activated his emergency lights and pulled the vehicle over. (Doc. 34-2, p. 20, tp. 71:13–21; Doc. 34-2, p. 45). Chief Hargett and the driver of the Cruze stopped near the edge of the roadway. (Doc. 43-1, p. 13, tpp. 47:21–48:13). The patrol unit was not fully out of the lane of travel; the unit was located slightly over the white line that separates the roadway from shoulder. (Doc. 34-2, p. 20, tp. 71:13–21; Doc. 43-1, p. 13, tpp. 47:21–48:13).

Donnie Vinson was travelling north along Highway 43, in the right-side lane, with his wife, daughter, and son-in-law as passengers in a white Dodge Ram 1500. (Doc. 43-1, pp. 12–13, 15, tpp. 42:19–43:3, 45:21–46:1, 54:17–20). Mr. Vinson was the driver; his son-in-law was sitting in the passenger seat; his wife was sitting in the back seat on the passenger side; and his daughter was sitting in the back seat on the driver's side. (Doc. 43-1, p. 12, tp. 44:1–10). The speed limit in the area was 65 miles per hour. (Doc. 34-2, p. 19, tp. 66:2–22). Mr. Vinson was approximately 300 yards from Chief Hargett and travelling between 55 and 60 miles per hour when he first noticed Chief Hargett's unmarked vehicle and its flashing lights. (Doc. 43-1, pp. 13–14, tpp. 48:14–17, 51:11–15). Simultaneously, Chief Hargett noticed in his rearview mirror Mr. Vinson's truck approaching. (Doc. 34-2, p. 20, tpp. 71:18–72:6).

4

When Mr. Vinson noticed Chief Hargett's patrol unit, there was a white SUV to the left of Mr. Vinson's truck, so Mr. Vinson could not move to the left lane. (Doc. 43-1, p. 15, tp. 53:10–21). Mr. Vinson applied his brakes as he approached Chief Hargett's patrol car. (Doc. 43-1, p. 15, tpp. 55:3–16; *see also* Doc. 34-3, p. 11, tpp. 36:7–11). At some point, Chief Hargett opened his driver's door slightly, but he did not get out of the vehicle. (Doc. 43-1, p. 17, tpp. 62:12–63:4). When he reached Chief Hargett's cruiser, Mr. Vinson was travelling between 48 and 50 miles per hour. (Doc. 43-1, pp. 15–16, tpp. 56:23–57:19). Mr. Vinson passed Chief Hargett without hitting Chief Hargett or his patrol unit. (Doc. 43-1, p. 17, tp. 62:7–11).

After Mr. Vinson passed Chief Hargett in his patrol unit, Chief Hargett pulled onto the roadway and pursued Mr. Vinson. (Doc. 34-2, p. 21, tpp. 74:19–75:3).[4] Chief Hargett activated the lights on his patrol unit, (Doc. 34-2, p. 21, tp. 76:20–23), but Mr. Vinson did not pull over. Mr. Vinson traveled just over one-half mile and turned right onto Lakeview Lane. (Doc. 34-2, p. 21, tpp. 75:19–76:2; Doc. 43-1, p. 19, tpp. 70:3–19). Chief Hargett followed Mr. Vinson onto Lakeview Lane and activated the siren on his patrol unit. (Doc. 34-2, p. 22, tp. 77:3–5). Chief Hargett

---

[4] As Chief Hargett re-entered the roadway, he pulled beside the Chevy Cruze and told the driver to stay "right there" because he would "be right back." (Doc. 34-2, p. 21, tpp. 74:19–75:3).

radioed dispatch that Mr. Vinson was not stopping his vehicle. (Doc. 34-2, p. 28, tp. 103:3–7; Doc. 34-2, p. 45).

Mr. Vinson did not hear the siren. (Doc. 43-1, p. 20, tp. 73:15–21). Mr. Vinson's daughter turned around in the backseat of the truck, looked out of the back windshield, and noticed Chief Hargett's patrol unit following closely behind. (Doc. 34-3, pp. 15–16, tpp. 52:10–53:14). She told Mr. Vinson that a police officer was attempting to stop him. (Doc. 34-3, p. 16, tp. 53:6–14). Mr. Vinson looked out of his side-view mirror and observed Chief Hargett's patrol unit. (Doc. 43-1, p. 20, tp. 76:3–11). According to Mr. Vinson, that was the first time he realized that Chief Hargett was trying to pull him over, (Doc. 43-1, p. 19, tpp. 70:20–6), but there was nowhere to pull over, (Doc. 43-1, p. 24, tp. 90:3–19). Mr. Vinson did not slow down, but he placed his left arm out of the side of his driver's door window and made a waving motion for approximately five seconds. (Doc. 34-3, pp. 24–25, tpp. 88–89; Doc. 43-1, p. 24, tpp. 89:20–93:07). Mr. Vinson intended that gesture to mean "follow me." (Doc. 43-1, p. 24, tp. 90:1–8). Chief Hargett saw Mr. Vinson's arm gesture and interpreted it to mean that Mr. Vinson was telling Chief Hargett to "come around" his vehicle. (Doc. 34-2, p. 25, tp. 90:11–14).[5]

---

[5] Until that arm gesture, Chief Hargett did not know whether Mr. Vinson was aware that he (Chief Hargett) was attempting to pull him over. (Doc. 34-2, p. 27, tp. 99:6–17).

After gesturing, Mr. Vinson drove another half-mile, passing five houses. He turned left onto Sheffield Circle, pulled into his driveway, and stopped his vehicle. (Doc. 34-1, p. 24, tp. 85:7–10; Doc. 43-1, p. 18, tpp. 66:17–67:11). Chief Hargett later learned that the driveway led to Mr. Vinson's home; Chief Hargett was not aware of this fact at the time. Each of the five houses Mr. Vinson passed had a driveway, and there was a side street – Country Club Road – before Mr. Vinson reached his driveway. (Doc. 34-1, p. 24, tpp. 85:23–86:16). Mr. Vinson did not stop in one of the driveways, and he did not pull over onto the side street, though he knew by then that Chief Hargett was behind him with his lights and siren activated. (Doc. 34-1, p. 24, tp. 87:10–20).

When Mr. Vinson arrived at his house, he parked, exited the vehicle, and walked to the back of his truck. (Doc. 43-1, p. 27, tp. 104:5–9). Mr. Vinson's son-in-law got out of the truck and went into the house. (Doc. 43-1, p. 27, tp. 104:5–14).

Chief Hargett exited his vehicle with his hand on his pistol. (Doc. 43-1, pp. 28–29, tpp. 108:12–109:5; Doc. 43-4, p. 29, tp. 111:21–25). Mr. Vinson asked Chief Hargett, "What's the problem, Officer?" (Doc. 43-1, p. 29, tp. 105:6–8). Chief Hargett, who was 10 to 12 feet from Mr. Vinson, screamed at Mr. Vinson, shouting that Mr. Vinson almost ran him over. (Doc. 43-1, p. 28, tpp. 105:6–10, 106:6–20).[6]

---

[6] Chief Hargett does not recall screaming at Mr. Vinson. (Doc. 34-2, p. 30, tp. 116:1–18). At this stage, the Court accepts Mr. Vinson's version of the events. *Thai Meditation Ass'n of Ala., Inc.*, 83 F.4th at 926.

Mr. Vinson responded that he did not see Chief Hargett exit his vehicle as he was passing him. (Doc. 43-1, p. 28, tpp. 106:21–107:1). Chief Hargett again stated that Mr. Vinson almost ran him over. (Doc. 43-1, p. 28, tp. 107:2–4). Chief Hargett moved towards Mr. Vinson and instructed Mr. Vinson to turn around and place his hands on the Dodge truck. (Doc. 43-1, p. 28, tp. 108:14–21). Mr. Vinson replied that he was not "putting [his] goddamn hands nowhere" because Chief Hargett had his hand on his gun and was "acting like [he] was going to shoot somebody." (Doc. 43-1, p. 29, tpp. 111:20–112:10).

Chief Hargett grabbed Mr. Vinson by the arm and twisted Mr. Vinson's arm behind his (Mr. Vinson's) back to pat Mr. Vinson down. (Doc. 43-1, p. 29, tp. 112:13–19; Doc. 34-2, p. 30, tp. 112:3–5). Mr. Vinson told Chief Hargett that he was hurting him and twisted out of Chief Hargett's grasp. (Doc. 43-1, p. 30, tp. 114:10–22; Doc. 34-3, p. 30, tp. 112:11–23). Mr. Vinson placed his hands in the air and started to back away from Chief Hargett. (Doc. 43-1, p. 30, tpp. 114:20–23). Mr. Vinson asked Chief Hargett what was wrong with him; Chief Hargett did not respond. (Doc. 43-1, p. 30, tpp. 115:3–14). Instead, Chief Hargett grabbed Mr. Vinson by the waist, picked Mr. Vinson up, and slammed Mr. Vinson to the ground. (Doc. 43-1, p. 30, tpp. 115:15–16:12). Mr. Vinson's head hit a concrete block, and his back hit the concrete driveway, knocking Mr. Vinson unconscious. (Doc. 43-1, p. 30, tp. 116:4–16; Doc. 34-3, pp. 31–32, tpp. 116:8–22). As Chief Hargett

8

handcuffed Mr. Vinson, Mr. Vinson regained consciousness. (Doc. 43-1, pp. 30–31, tpp. 116:13–22).

When he got his bearings, Mr. Vinson told Chief Hargett that he hurt him; Chief Hargett responded that Mr. Vinson was not hurt. (Doc. 43-1, p. 31, tp. 117:17–118:10). Mr. Vinson's daughter, who works as a nurse, asked Chief Hargett if she could check on Mr. Vinson; Chief Hargett would not allow her to do so. (Doc. 43-1, p. 31, tpp. 118:16–119:6; Doc. 34-3, pp. 32–33, tpp. 120:16–121:8). As the situation between Mr. Vinson and Chief Hargett unfolded, other officers arrived at the scene. After Chief Hargett handcuffed Mr. Vinson, Mr. Vinson was placed in Sergeant Craig Bouillon's vehicle and taken to the Russellville City Jail, where Mr. Vinson stayed for about three hours before posting bond. (Doc. 34-1, pp. 34–35, tpp. 131:5–133:15; *see also* Doc. 34-2, p. 44).

Mr. Vinson was charged with eluding a law enforcement officer and resisting arrest. (Doc. 34-2, pp. 64, 66, 71). He received a traffic citation for violating Alabama's Move Over Law. (Doc. 34-2, p. 65). Following a bench trial in the Russellville Municipal Court, Mr. Vinson was convicted of one count of Attempting to Elude Police and one count of violating the Move Over Act for Law Enforcement. (Doc. 34-8, p. 2).[7] Mr. Vinson appealed his conviction to the Franklin County

---

[7] The Municipal Court's order does not mention Mr. Vinson's resisting arrest charge. (*See* Doc. 34-2, p. 72).

Circuit Court; a jury found Mr. Vinson not guilty.  (Doc. 34-2, p. 73; Doc. 34-9, pp. 2, 187–88).

As a result of the interaction with Chief Hargett, Mr. Vinson suffered a spinal injury.  (*See* Doc. 34-1, p. 46, tpp. 173:17–176:14).  Mr. Vinson experiences post-traumatic stress disorder.  (Doc. 34-1, p. 48, tpp. 182:11–184:19).

## III.

In his motion for summary judgment, Chief Vinson relies on the affirmative defense of qualified immunity.  Qualified immunity "protects police officers from suit in their individual capacities for discretionary actions performed in the course of their duties."  *Carter v. Butts Cnty.*, 821 F.3d 1310, 1318 (11th Cir. 2016) (first citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and then citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Bogle v. McClure*, 332 F.3d 1347, 1355 n.5 (11th Cir. 2003).  Qualified immunity offers a complete defense to officers sued in their individual capacities if the officers' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818.  The doctrine of qualified immunity "'balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from . . . liability when they perform their duties reasonably.'"  *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333 (11th Cir. 2024) (quoting *Townsend v. Jefferson*

10

*Cnty.*, 601 F.3d 1152, 1157 (11th Cir. 2010)). District courts determine whether qualified immunity applies "on a claim-by-claim and defendant-by-defendant basis." *Miller*, 129 F.4th at 1333 (citing *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018)).

"To enjoy qualified immunity's protection, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Jarrad v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1323 (11th Cir. 2024) (internal quotations and citation omitted), *cert. denied sub nom.*, *Moats v. Jarrard*, 145 S. Ct. 2702 (2025). The discretionary authority "requirement is 'readily satisfied' by 'police officers conducting arrest and investigative functions' while on duty." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1363–64 (11th Cir. 2024) (quoting *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019)). District courts "look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). "Police officers acting in their discretionary authority are entitled to qualified immunity from suit unless a plaintiff can establish that (1) the officer violated a constitutional right, and (2) the right violated was clearly established." *Alston v. Swarbrick*, 954 F.3d 1312, 1318

11

(11th Cir. 2020) (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010)); *Jarrard*, 115 F.4th at 1323 (quotation omitted).  To demonstrate that a right was clearly established, a plaintiff may:

> point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court[,] . . . identify a broader, clearly established principle that should govern the novel facts of the situation[,] . . . [or] show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary.

*Stalley v. Cumbie*, 124 F.4th 1273, 1284 (11th Cir. 2024) (quoting *Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259–60 (11th Cir. 2018)).

Because Mr. Vinson's claims concern Chief Hargett's conduct during a traffic stop, Chief Hargett has met his burden of showing that he acted within the scope of his discretionary authority.  Therefore, Mr. Vinson must demonstrate that Chief Hargett violated his (Mr. Vinson's) Fourth Amendment right to be free from an unlawful arrest and from the use of excessive force in effectuating that arrest and that those rights were clearly established.

### *Unlawful Arrest*

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. Amend. IV.  "[A]n arrest is a seizure of the person" and must be reasonable, or else it violates the Fourth Amendment.  *See Skop v. City of Atl.*, 485 F.3d 1130, 1137 (11th Cir. 2007).  A "warrantless arrest without probable cause violates the Fourth Amendment and

12

forms a basis for a section 1983 claim." *Alston v. Swarbrick*, 954 F.3d 1312, 1318 (11th Cir. 2020) (quoting *Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016)). "[P]laintiffs have the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 claim." *Gill v. Judd*, 941 F.3d 504, 523 (11th Cir. 2019) (brackets in *Gill*) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998)).

Probable cause exists when, based on the totality of the circumstances, "a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." *Garcia v. Casey*, 75 F.4th 1176, 1186 (11th Cir. 2023) (alterations in *Garcia*) (quoting *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022)). "Probable cause is based on what a reasonable officer would think at the time of arrest—not on what they could understand with the benefit of hindsight. And probable cause requires only a substantial chance of criminal activity, not certainty." *United States v. Leonard,* 4 F.4th 1134, 1146 (11th Cir. 2021) (internal citations omitted). Additionally, "evidence of every element of a crime is not required for a showing of probable cause." *Davis v. Apopka*, 78 F.4th 1326, 1335 (11th Cir. 2023). "[E]ven for a criminal statute that requires proof of [] intent to" support a conviction, "an arresting officer does not need evidence of the intent for probable cause to arrest to exist." *Jordan v. Mosely*, 487 F.3d 1350, 1356 (11th Cir. 2007).

13

An underlying state court conviction may help establish probable cause. Under the Full Faith and Credit Clause of the Constitution, federal courts must give "a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1319 (11th Cir. 2017) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)).  Under Alabama law, a municipal court conviction is "prima facie evidence of probable cause for instituting the prosecution, even though the conviction was later vacated." *Woodruff v. City of Tuscaloosa*, 101 So. 3d 749, 753 (Ala. 2012) (quoting *Gunter v. Pemco Aeroplex, Inc.*, 646 So. 2d 1332, 1333 (Ala. 1994)); *see generally Ruffino v. City of Hoover*, 891 F. Supp. 2d 1247, 1273 (N.D. Ala. 2012) (finding that the plaintiff presented sufficient evidence to overcome the presumption of probable cause afforded by a municipal court conviction).  This presumption "may be rebutted by any competent evidence which clearly overcomes the presumption arising from the fact of [plaintiff's] conviction in the first instance." *Ruffino*, 891 F. Supp. 2d at 1273 (internal quotations omitted).

If actual probable cause is lacking, an officer may be entitled to qualified immunity "so long as the officer had 'arguable probable cause' for the arrest." *Alston*, 954 F.3d at 1318 (quoting *Skop*, 485 F.3d at 1137).  "Arguable probable cause exists if 'reasonable officers in the same circumstances and possessing the

14

same knowledge as the [d]efendants could have believed that probable cause existed to arrest the plaintiff." *Alston*, 954 F.3d at 1318 (quoting *Davis v. Williams*, 451 F.3d 759, 762 (11th Cir. 2006)).  Courts employ an objective standard in determining whether arguable probable cause exists, "asking whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (internal quotations omitted) (quoting *Vaughan v. Cox*, 264 F.3d 1027, 1036 (11th Cir. 2001)).

"If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 347–49, 352–54 (2001) (finding that an arrestee's Fourth Amendment rights were not violated when she was arrested for failing to secure her children with seatbelts, driving without her own seatbelt, driving without a license, and failing to provide proof of insurance, though the failure to put seatbelts on the children was only a misdemeanor punishable by a fine); *see also Lee*, 284 F.3d at 1195 (discussing *Atwater*).

A traffic stop is a seizure under the Fourth Amendment and must be reasonable under the circumstances. *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022); *Whren v. United States*, 517 U.S. 806, 811 (1996).  A traffic stop

15

is reasonable when an officer has probable cause or reasonable suspicion that a crime has been committed. *Whren*, 517 U.S. at 810; *Campbell*, 26 F.4th at 880. "Even minor traffic violations qualify as criminal activity." *Campbell*, 26 F.4th at 880.

Alabama's Move Over Act requires drivers who encounter a parked law enforcement vehicle displaying its flashing lights on a "highway with two or more lanes traveling in the direction of the law enforcement vehicle" to "vacate the lane closest to the law enforcement vehicle," or, if the driver is unable to get over, to "slow to a speed that is at least 15 miles per hour less than the posted speed limit unless otherwise directed by a law enforcement officer." Ala. Code § 32-5A-58.2(b)(1).

Here, while Chief Hargett was conducting a traffic stop on the right shoulder of a four-lane state highway, Chief Hargett saw that Mr. Vinson did not move into the left lane as Mr. Vinson approached the traffic stop. Chief Hargett did not see a vehicle to Mr. Vinson's left, a vehicle which Mr. Vinson contends prevented him from moving over. Chief Hargett believed that Mr. Vinson did not reduce his speed to 15 miles per hour below the speed limit as he passed Chief Hargett's vehicle. Therefore, Chief Hargett had probable cause to believe that Mr. Vinson violated Ala. Code § 32-5A-58.2(b)(1), making it lawful for Chief Hargett to pursue and stop Mr. Vinson. *See Campbell*, 26 F.4th at 880; *Whren*, 517 U.S. at 810–11. When Chief Hargett pursued Mr. Vinson, Mr. Vinson did not stop. Alabama law makes it a crime

16

"for a person while operating a motor vehicle on a street, road, alley, or highway in this state, to intentionally flee or attempt to elude a law enforcement officer after having received a signal from the officer to bring the vehicle to a stop." Ala. Code § 13A-10-52(b). [8]

Mr. Vinson acknowledges that he continued driving after he saw Chief Hargett following with his patrol unit's lights flashing and siren wailing. (*See, e.g.*, Doc. 43-1, p. 24, tp. 90:3–19). Mr. Vinson made an arm gesture towards Chief Hargett and drove past five driveways and a side street before turning into his driveway and stopping. Mr. Vinson's purported lack of awareness of Chief Hargett's pursuit for some distance, Mr. Vinson's hearing difficulties, and the fact that the driveway in which Mr. Vinson stopped led to Mr. Vinson's home are not relevant in analyzing probable cause because Chief Hargett was not aware of these facts. *See Leonard,* 4 F.4th at 1136. Based on what Chief Hargett knew when he

---

[8] Chief Hargett testified that the attempting to elude charge against Mr. Vinson authorized him (Chief Hargett) to make a custodial arrest. (Doc. 34-2, pp. 31-32, 34). Mr. Vinson's expert and Chief Hargett's expert testified that Chief Hargett could not have made a custodial arrest based on a violation of Alabama's Move Over Act. (Doc. 34-5, pp. 11-12; Doc. 34-7, p. 11, tpp. 33-34). A violation of the Move Over Act is a misdemeanor punishable by a fine. Ala. Code. § 32-5A-58.2(b)(1). The Supreme Court has held that traffic violations with similar punishments may provide a basis for a custodial arrest. *See generally*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 323–24, 354–55 (2001) (finding that an arrestee's Fourth Amendment rights were not violated when she was arrested for failing to secure her children with seatbelts, driving without her own seatbelt, driving without a license, and failing to provide proof of insurance); *see also Lee*, 284 F.3d at 1195 (discussing *Atwater*). The Court need not decide whether a violation of the Move Over Act provides a basis for a custodial arrest because probable cause existed to support a custodial arrest for attempting to elude.

17

arrested Mr. Vinson, there was sufficient evidence to give Chief Hargett reasonable suspicion or probable cause to believe that Mr. Vinson was attempting to elude Chief Hargett. Therefore, Chief Hargett's arrest of Mr. Vinson did not violate Mr. Vinson's Fourth Amendment rights.

Additionally, Mr. Vinson was convicted of attempting to elude and violating the Move Over Act in Russellville Municipal Court. (Doc. 34-2, p. 72). Though Mr. Vinson was later acquitted of those charges on appeal, the municipal court conviction creates the presumption that probable cause existed to arrest Mr. Vinson for eluding. *See Woodruff*, 101 So. 3d at 753; *see also Yancey*, 472 So. 2d at 992. To rebut this presumption, Mr. Vinson argues that he did not intend to elude, (*see* Doc. 44, pp. 35–43), but Mr. Vinson's intent is not determinative of probable cause. *See Apopka*, 78 F.4th at 1335; *Jordan*, 487 F.3d at 1356. Chief Hargett only had to conclude that, based on the circumstances, "there was a substantial chance" that Mr. Vinson was attempting to elude. *See Garcia*, 75 F.4th at 1186.

Chief Hargett knew that Mr. Vinson did not pull over after Chief Hargett activated his lights and sirens, that Mr. Vinson did not slow down after gesturing to Chief Hargett, and that Mr. Vinson drove past five driveways and a side street before stopping his vehicle.[9] Therefore, Mr. Vinson's purported lack of intent does not

---

[9] The Court recognizes that Chief Hargett did not activate his sirens until after Mr. Vinson completed his first turn onto Lakeview Lane. (Doc. 34-2, pp. 21–22).

"clearly overcome" the presumption of probable cause that rests on the underlying municipal court conviction. *Ruffino*, 891 F. Supp. 2d at 1273 (internal quotations omitted).

Even if Mr. Vinson's admissions and the municipal court conviction could not support a finding of actual probable cause, arguable probable cause existed for Mr. Vinson's arrest. After Mr. Vinson made an arm gesture and continued driving without reducing his speed, it was objectively reasonable for Chief Hargett to believe that Mr. Vinson was attempting to elude. Therefore, at the very least, arguable probable cause existed, making Mr. Vinson's arrest lawful.

Accordingly, Chief Hargett is entitled to qualified immunity on Mr. Vinson's unlawful arrest claim.

### Excessive Force

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Stephens*, 852 F.3d at 1321 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Stephens*, 852 F.23d at 1321 (brackets in *Stephens*) (quotations omitted). Because force and injury are "typical" during an arrest, *Mobley v. Palm Beach Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015), "during an arrest . . . 'the

application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment,'" *Baxter v. Roberts*, 54 F.4th 1241, 1269 (11th Cir. 2022) (quoting *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000)).

"[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand." *Stephens*, 852 F.3d at 1321 (brackets in *Stephens*) (quoting *Lee*, 284 F.3d at 1197). A qualified immunity analysis on these grounds turns on "whether the force used by the officer in the course of an arrest [was] excessive," "a pure question of law" which a court must decide. *Stephens*, 852 F.3d at 1332 (brackets added) (internal quotation marks omitted) (quoting *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013)). Courts consider three non-exhaustive factors when analyzing the reasonableness of use of force: the severity of the crime at issue; the urgency of the threat the suspect poses to officers or others, if any; and the suspect's amount of resistance or risk of evasion by flight. *Stephens*, 852 F.3d at 1322 (citing *Graham*, 490 U.S. at 396).

The traffic offenses at issue in the state court were misdemeanors. *See* Ala. Code §§ 13A-10-52, 32-5A-58.2(b)(1). This *Graham* factor weighs in Mr. Vinson's favor. As to the threat Mr. Vinson posed, Chief Hargett testified that he had no reason to believe that Mr. Vinson was armed. (Doc. 34-2, p. 30, tpp. 109–10). Chief

Hargett did not feel threatened by the other passengers in Mr. Vinson's truck. (Doc. 34-2, p. 30, tpp. 12–16). Therefore, the second *Graham* factor weighs in Mr. Vinson's favor. As to the third factor, Mr. Vinson acknowledges that he used vulgar language and refused to follow Chief Hargett's orders. Mr. Vinson admits that he pulled away from Chief Hargett when Chief Hargett first grabbed his arm, and Mr. Vinson had just led Chief Hargett on a pursuit when Mr. Vinson failed to pull over and had made an ambiguous arm gesture to Chief Hargett from his car window in the process. On this undisputed evidence, the third *Graham* factor weighs in favor of Chief Hargett.

In assessing force, circuit precedent provides important guidance. To that end, *Baxter v. Roberts*, 54 F.4th 1241 (11th Cir. 2022) is instructive. The officer in *Baxter* pulled the plaintiff over after the officer saw the plaintiff swerve in and out of lanes, a minor traffic infraction. 54 F.4th at 1251. During the traffic stop, the officer noticed an open container in the plaintiff's cupholder. *Baxter*, 54 F.4th at 1251. The officer instructed the plaintiff to "hang tight" while the officer wrote the plaintiff a warning ticket and walked a drug-dog around the plaintiff's vehicle. *Baxter*, 54 F.4th at 1251. After returning to the patrol unit, but before printing a warning, the officer returned to the plaintiff's vehicle and instructed the plaintiff to exit the vehicle. *Baxter*, 54 F4th at 1251. The plaintiff initially refused and argued that the officer lacked probable cause. *Baxter*, 54 F.4th at 1251. Ultimately, the

21

plaintiff complied and exited his vehicle. *Baxter*, 54 F.4th at 1251. When the officer asked the plaintiff to hand over his keys, the plaintiff refused; the officer then decided to arrest the plaintiff for nonviolent obstruction. *Baxter*, 54 F.4th at 1251. In arresting the plaintiff, the officer grabbed the plaintiff's arm, forced him to the ground, twisted his arm, and placed him in handcuffs. *Baxter*, 54 F.4th at 1252. The plaintiff was charged with an open container violation and for nonviolent obstruction; the obstruction charge later was dismissed. *Baxter*, 54 F.4th at 1252.

The plaintiff sued the officer, alleging, among other things, that the officer violated his Fourth Amendment rights by using excessive force in effectuating the arrest. *Baxter*, 54 F4th at 1250. The district court found that the officer was entitled to qualified immunity on the plaintiff's excessive force claim, and the plaintiff appealed. *Baxter*, 54 F.4th at 1253. The Eleventh Circuit affirmed and explained that under the circumstances, the officer's force was lawful because the plaintiff was resisting arrest and the force used was de minimus. *Baxter*, 54 F.4th at 1269. The Eleventh Circuit relied on *Myers v. Bowman*, 713 F.3d 1319 (11th Cir. 2013), and *Rodriguez v. Farrell*, 280 F.3d 1341 (11th Cir. 2002).

In *Myers*, the Eleventh Circuit determined that an officer's force was not excessive when the officer "grabbed [the plaintiff] by the arm, forced him to the ground, placed him in handcuffs, and searched him." 713 F.3d at 1327–28 (brackets added). Similarly, in *Rodriguez,* the Eleventh Circuit determined that the officer did

22

not use excessive force when the officer "grabbed [the] plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him." 280 F.3d at 1351 (brackets added).

Here, Chief Hargett instructed Mr. Vinson to place his hands on the truck, but Mr. Vinson verbally refused. Then, when Chief Hargett approached Mr. Vinson and attempted to place Mr. Vinson's arm behind his back, Mr. Vinson spun out of Chief Hargett's grasp, physically resisting Chief Hargett's attempt to restrain Mr. Vinson's hands. Therefore, under the binding precedent in *Baxter*, *Myers*, and *Rodriguez*, Chief Hargett did not use excessive force in effectuating Mr. Vinson's arrest when Chief Hargett took Mr. Vinson to the ground after Mr. Vinson verbally and physically resisted Chief Hargett's efforts to place Mr. Vinson in handcuffs. Mr. Vinson does not argue that Chief Hargett used additional force after placing him in handcuffs. Accordingly, Chief Hargett is entitled to qualified immunity on Mr. Vinson's excessive force claim.[10]

**IV.**

---

[10] The evidence indicates that as he fell, Mr. Vinson hit his head on a concrete paver, but there is no evidence that Chief Hargett knew that the paver was there or that he intended for Mr. Vinson to fall on or near the paver. Mr. Vinson's belief that Chief Hargett was "acting like [he] was going to shoot somebody," (Doc. 43-1, p. 29, tpp. 111–12), does not change the character or degree of force that Chief Hargett used.

For the reasons discussed above, the Court grants Chief Hargett's motion for summary judgment on Mr. Vinson's Fourth Amendment claims. The Clerk shall please **TERM** Doc. 35. The Court will enter a final judgment.

**DONE** and **ORDERED** this July 24, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE